MAUGA FAMILY by Sueuga, Plaintiff

v.

MAUGA A. of Pago Pago, Defendant

No. 17-1937

High Court of American Samoa

Civil Jurisdiction, Trial Division

[Matai Name: "Mauga" of Pago Pago]

May 27, 1938

A. A. MORROW, *Chief Justice;* and MULI, *District Judge*

## DECISION

This case was heard by the High Court on April 5th and 6th, 1938, Sueuga having as his counsel Tulifua and Faiaoga, and Mauga as his counsel Tavai. After the case was heard, the Court being of the opinion that the parties should have an opportunity to effect a reconciliation, if possible, called them and their counsel before it and gave them thirty days to reach a settlement. On May 11th, the thirty days having expired, Mauga, Sueuga, Teo and Faiaoga, counsel for Sueuga, came to the office of the Chief Justice and informed him, Saipale acting as interpreter, that a settlement had not been reached although he (Mauga) had promised to return the Utaifeau title, which title will be hereinafter referred to.

The Court listened with great care to all of the testimony and the writer of this decision has read the 65 page type-written transcript thereof very carefully three times and many parts of it five and six times. The Samoan member of the Court has also considered the testimony carefully.

At the very outset it should be stated that this Court is bound by the law. It must decide cases according to the law of American Samoa. If it were otherwise the liberties, titles, and property of the Samoans would be in danger. The Court must take the law as it finds it. It cannot make law. The power to make law in American Samoa is vested in the Governor, not the Judges. Section 3, Subdivision 4, of the Codification of the Regulations and Orders for the Government of American Samoa provides that the Governor shall be "the maker of all laws ...".

This is a proceeding brought by certain members of the Mauga family by Sueuga, hereinafter referred to as

the complainant, for the removal of Mauga as the matai. It was instituted pursuant to Section 79(5) of the Codification. We think it is equitable in its nature and that the Court in reaching a decision should apply the principles of equity should it be necessary to do so. The High Court has equity jurisdiction by virtue of Section 3(28) of the Codification.

Section 3(1) of the Codification among other things provides that "... so much of the common law of England as is applicable and not repugnant to or inconsistent with the Constitution and laws of the United States of America, and the laws of American Samoa, is declared to be in full force in American Samoa." That the principles of equity are a part of the common law is well recognized. See 12 Corpus Juris at page 183. It follows, therefore, that the principles of equity not "repugnant to or inconsistent with the Constitution and laws of the United States of America and the laws of American Samoa" are a part of the law of American Samoa.

It is a well established principle of equity that he who seeks the aid of an equity court in a matter must himself have acted conscientiously as regards the same matter. With reference to this principle, which is not repugnant to or inconsistent with the Constitution and laws of the United States and the laws of American Samoa, it is stated in I Pomeroy's Equity Jurisprudence 658 (3rd Ed.) that "While a court of equity endeavors to promote and enforce justice, good faith, uprightness, fairness, and conscientiousness on the part of the parties who occupy a defensive position in judicial controversies, it no less stringently demands the same from the litigant parties who come before it as plaintiffs or actors in such controversies."

Some of the history behind the present litigation should now be related to the end that it may be fully understood.

The defendant, who is the present Mauga, was awarded his title by a decision of the High Court of American Samoa filed on November 10, 1935. That decision on file in the Public Records of American Samoa shows that in the litigation leading up to it the proponent of the name was Afamasaga Sialega (the present Mauga) and the objectors were Manuma, Fano, Teo, Sueuga, Iulio and Tau. The decision makes it clear that the proponent and all of the objectors appeared in court and that evidence was received in behalf of each of them for the purpose of showing his legal right to the name. The trial was had on October 21 and 22, 1935. The court then considered the evidence, applied the law of American Samoa, and reached the conclusion that under the law and the evidence, Afamasaga Sialega should be awarded the matai name Mauga. The court in the decision said in part: "In making this decision the Court has been guided not only by the hereditary rights of the respective candidates and the question of services rendered by each of them to the head of the family but by the question, whether the candidate if named, by the court, would be considered by the Government as a proper person to hold the office of County Chief." This latter matter was considered because the high title of County Chief had in the past been conferred upon the holder of the title Mauga.

One of the objectors, Fano, during the trial renounced his rights in favor of Manuma. Upon it appearing that Tau, another of the objectors, was born in Upolu, Tulifua, who was counsel for Sueuga in this case, and a brother of Tau, was substituted for him. Under the law the name could be awarded to one candidate only and not to six. The court unanimously awarded the name to the present Mauga.

It is the well established custom in American Samoa for the losing candidate in a matai name case to abide by the decision of the court, and to effect a reconciliation with the candidate to whom the name is awarded to the end that

the family may live in peace and harmony. The Samoans are a splendid people and they have many splendid customs. That is one of them. It is founded upon the very obvious fact that the general welfare of all of the members of the family is superior to the personal interest of any particular candidate whether he be awarded the name, or not. The spirit expressed by the Master when he said "Blessed are the peacemakers for they shall be called the sons of God." Matthew V: 1–9, motivates the action of the losing candidate who effects a reconciliation, thereby bringing peace and harmony into the family.

A letter dated November 30, 1937 and signed, among some others, by every one of the losing candidates in the matai name Mauga case just referred to is a part of the record in this case. Among other things, it states that immediately after the decision was sent to them they expressed their "great surprise and entire dissatisfaction" that the present Mauga had been awarded the title. They even complained to the Attorney General but he could do nothing for them, the matter not being withing [sic] his cognizance. Obviously the basis of their objection at that time to Mauga's having the title was not anything that he had, or had not done as the Mauga for he had just gotten the title and had not yet had an opportunity to do, or not do, anything about which they could have complained. They did not follow the Samoan custom and adopt a conciliatory attitude in order that peace and harmony might be restored in the family. In this action they accuse Mauga of not following Samoan custom when they did not do it themselves.

The evidence shows that according to Samoan custom Mauga called family meetings and sent for the losing candidates for the purpose of trying to conciliate them. The evidence also shows that the losing candidates did not adopt a conciliatory attitude. In fact it appears that all of them were so hostile that they failed to come to some of the meet-

ings. The records in the Administration Building show that under the date of January 21, 1936 Sueuga filed a written request with the Governor asking that "the decision of the title Mauga be rectified and take trial in the High Court." The Governor refused interference since the High Court had determined the matter of the title. This request of Sueuga contains statements to show why he should have the title, and the inference in the letter very plainly is that Mauga should not have it. It is a most significant fact that Sueuga in that request did not complain about a single act of Mauga as the Mauga although at the time the request was filed he had held the title for more than two months. If Mauga did so many things that were wrong within a short time after he got the title, as the complainant by his witnesses attempted to prove, why did not complainant Sueuga set them out in the aforementioned request to the Governor? It was claimed in the present case, and we think the principal complaint was, that he was guilty of arrogance and uncalled for arbitrary action in the removal of certain titles very shortly after he was made the Mauga. This arrogance and arbitrary action, if it occurred at all, must, according to the evidence, have occurred before Sueuga filed the above request.

The very fact that Sueuga attributed no such action, or any other misconduct, to Mauga as the Mauga in the request is a clear indication that on January 21, 1936 he did not regard Mauga's conduct improper in any way; otherwise he would have mentioned it. The fact that Sueuga made the written request, together with its contents, constitutes very strong circumstantial evidence that Sueuga had no complaint about Mauga, but only that he hoped through the request to get Mauga removed from the title and secure it himself through a later court decision. If he did not so desire, why should he have delineated his claim to the Governor? It is a significant fact that it is Sueuga through

whom certain members of the family bring the present action. He is opposed to Mauga in this proceeding; during the trial of the case he sat with his counsel and assisted them; he was one of the principal witnesses against Mauga. He is obviously a leader in the efforts to oust Mauga. If Mauga was guilty of the arrogance and arbitrary action accredited to him, why did not Sueuga say so in his request to the Governor? We think that there was no such misconduct on Mauga's part and that that is the reason Sueuga did not say that there was. Some witnesses testified that there were arrogance and arbitrary action and some that there were not. After weighing the testimony in the light of all the circumstances, we think the evidence distinctly preponderates in favor of the view that Mauga was not arrogant or arbitrary in his dealings with his family; nor do we believe from the evidence that he was overbearing or insolent in his behavior toward the village chiefs or that he was guilty of conduct that brought his family into disrepute. The witnesses, who testified on these issues for Sueuga, were for the most part the very men who were the objectors in the matai name case Mauga in 1935 and who naturally would be candidates for the name Mauga should he now be removed from the title by this court.

Poi, a village chief of Pago Pago, and not a member of the Mauga family, a man who would not be a candidate for the title if Mauga should be removed, testified that Mauga always treated the other chiefs of the village with proper respect and was not insolent or overbearing toward them. Poi sat in the meetings of the village chiefs when Mauga was present and were in a position to know the truth on this matter. It was also claimed that Mauga exhibited arrogance and high handedness in connection with the land Fatumafuti. A carbon copy of a letter signed by former Chief Justice Wood was introduced in evidence in connection with this matter. The letter shows that the Chief Jus-

tice, relying upon a court decision rendered in June 1909 respecting the land, advised certain people then living on the land that it belonged to Mauga under the court decision. We cannot see how there was any arrogance or high handedness on Mauga's part merely because he came to the Chief Justice for the purpose of protecting his title to the land Fatumafuti.

Poi testified that Mauga's conduct as the Mauga was becoming to the holder of the title. If it was, and we believe that Poi was telling the truth, then there is no substantial basis to the charge that his conduct brought shame and ridicule to the Mauga family. There was a charge that Mauga's thoughtless and foolish orders created dissatisfaction in the village. According to the evidence the basis for this charge grew principally out of Mauga's getting a siva siva team from Pago Pago ready to go to the Manua Flag Day celebration. The claim was that he disobeyed the direction of the Attorney General regarding the number of people that should be on the team. Before any misconduct in this connection could be attributed to Mauga it would have to appear

(1) what the direction was,

(2) that Mauga understood the direction, and

(3) that he disobeyed it.

The evidence against Mauga is that he told the Pago Pago village chiefs that the Attorney General had instructed him to have about 80 on the team and that instead of about 80 Mauga had 100. While we do not approve of this conduct, nevertheless it should not be regarded as serious enough to warrant Mauga's removal as the Matai. It is true that there was some hearsay testimony to the effect that the team was supposed to have only forty on it, but since it was only hearsay, and not being given as of the actual knowledge of the witnesses, it must be disregarded. If the Attorney General did tell Mauga to have forty on

the team, there was no proof to show that Mauga understood that it was to be forty and not about eighty. It would not be fair to Mauga, on the evidence before the court to assume that Mauga understood that he was to have forty on the team since the Attorney General is a palagi and Mauga is a Samoan. There was no testimony that Mauga and the Attorney General conversed through an interpreter and none that Mauga speaks English well. There was no evidence that the direction was in writing. This court is not at all convinced from the testimony that the Attorney General did tell Mauga forty or, if he did, that Mauga so understood. The charge was not proved to our satisfaction.

It was charged that his relations with the Mauga family were so bad "that they are past mending on account of his pride and lack of sound judgment"; also that on account of his conduct and lack of the necessary qualities of a leader "he has destroyed the harmony and the cooperation of the villages of his county; and that he has lost the respect that the whole District was formerly wont to pay" to the name Mauga.

After weighing the testimony of all the witnesses who testified on these charges we are pretty firmly convinced that there was no very substantial foundation for them. Whether the family differences can be mended is a matter of opinion only, and not of positive knowledge. Olotoa told the court that Mauga has not lost the respect that goes with the title and that he enjoys the respect of the chiefs. If the Mauga name does not carry the prestige and respect that it once did, such apparently is not because of the misconduct of the present Mauga, but because his family is divided and continues to be so despite his efforts to get it together. The court must not shut its eyes to the obvious fact, which the evidence clearly shows, that the leaders who are behind the present action to remove Mauga were the candidates who lost the Mauga case in 1935. They have failed through

no fault of his to become reconciled with Mauga and to help him bring all factions in the family into harmony. They blame Mauga for not getting the family to live in peace and harmony, when, at the same time, the evidence shows that they have opposed Mauga ever since he got the title and have refused his overtures for reconciliation. At various times each of them has failed to come to meetings of the family called by Mauga to promote peace and harmony.

The Court will now consider evidence on the amendment dated March 30, 1938 (six days before the trial) which was added to the original complaint dated November 30, 1937. At the outset the court wonders, if there be a substantial amount of truth in the amendment, why the charges contained in it were not put in the original complaint dated four months earlier. It is indeed peculiar, since most of the facts, if any, to support the amendment must have existed when the original complaint was filed and must have been know [sic] to the complainant at that time. Although the court at this point expresses no opinion on the truth or untruth of the charges in the amendment the circumstance that these charges were not included in the original complaint is perfectly consistent with the inference that they either have no foundation in fact or that the complainant did not consider that there was enough truth in them to warrant their includion [sic] in the original complaint.

The first charge in the amendment is that the defendant was stealing. Sueuga introduced evidence that Mauga had stolen a bunch of bananas from Poi's plantation, but the evidence taken as a whole convinces us that he did not. Poi himself testified that he and Mauga had an understanding that each could take things from the other's plantation and he also testified that when he heard it was Mauga that was charged with stealing the bananas he asked Teo to dismiss the charge. This request was perfectly consistent with such an understanding.

The second charge in the amendment was that Mauga instructed his village "to declare war against another village when he would give signal." We think the evidence as to this charge, although it is conflicting, preponderates in favor of the view that Mauga gave no such instruction. Tapuasa testified that he was with Mauga when Mauga was supposed to have advocated the fighting and that Mauga gave no instruction to fight. Although it is not a controlling matter, it may be stated that there was no signal given by Mauga and no fighting.

The third charge in the amendment is that Mauga "had taken pigs and food provisions, etc., from some members of the family under false intention and false promises, which caused more grievances and distress among some members of the family." The evidence in support of this charge was to the effect that Sueuga furnished a pig and provisions for Mauga's wife at the Samoan Hospital sometime in 1936 after Mauga had promised him to get the family to live in harmony and to restore the Utaifeau title. Matila Pisa testified that the charge was not true. He is not a member of the Mauga family. If Mauga did make the promises as charged there is nothing to show that he did not truthfully intend to carry out both of them. If at the time he made the alleged promises he intended to abide by them, they would neither be false nor made with false intentions. However, the evidence shows that he did try to effect a reconciliation in the family after the alleged promise. He acted in good faith as respects that alleged promise if it was made. We shall discuss the matter of the Utaifeau title later.

The fourth charge of the amendment is that Mauga "had written and issued a money begging latter" [sic] by which money was collected from the public. And "while he had the benefit of using the money in the meantime the good reputation and honor of the title and family were and are

being disgraced and ridiculed." We believe that Mauga issued the letter and that it was not a discreet thing for him to do, but the evidence clearly shows that he himself did not have the use of the money. It was turned over to the L. M. S. Church. He did nothing wrong or criminal in this connection. At the most issuing the letter was only an indiscretion.

The fifth charge relates to an instruction of Mauga that some members of the family should make donations of money "for an alofa of the late Mauga Moimoi to the village faifeau and also to the mission." There was nothing wrong with such instruction. If Mauga had gotten the money donated and kept it for his own benefit there would have been a serious wrong, but the evidence preponderates in favor of the view that the money was used for the purposes for which it was given, and not by Mauga personally. We think that this charge is without foundation.

The sixth charge in the amendment relates to the siva siva team already referred to which the Attorney General instructed Mauga to get ready to go to the Manua Flag Day celebration. We have discussed this matter in connection with one of the charges in the original complaint and nothing further need be said about it.

The seventh charge in the amendment is in substance that Mauga as County Chief ordered the U. S. flag to be raised and then allowed it to remain on the pole during the night following. Iulio, who gave the testimony for Sueuga on this charge, admitted on the stand that he did not know whether the flag hung on the pole all night or not. Obviously the charge was not proved.

The eighth charge in the amendment is to the effect that Mauga permitted a certain high talking chief of the village of Pago Pago to be beaten in his (Mauga's) fale and in his presence by a man under his control. The high talking chief testified for the complainant. The transcript of the testi-

598

mony shows that he testified at one time that he was beaten and that a little later on he testified that he was not beaten at all. In view of the unsatisfactory state of the testimony on this charge we cannot regard it as proved.

Since Mauga is the County Chief of his county and the title of County Chief is usually associated with the Mauga name, the court heard testimony from Attorney General J. C. Van Cleve in regard to Mauga's work as County Chief. It appears from the Attorney General's testimony that there had been some complaints brought to his office about Mauga's work as County Chief and that a Board of Investigation, of which the Attorney General was Chairman, met to investigate the conditions existing in Mauga's county. The report of the Board was introduced in evidence. It is significant that the Board made no recommendation that Mauga be removed as County Chief. Apparently the Board despite the complaints concluded that his work was at least reasonably satisfactory. That is a proper inference to draw. The Attorney General testified that Mauga had "the hardest job of any county chief in American Samoa, chiefly because his county covers the bay area here." He stated that the records in his office showed that the village of Pago Pago under the present Mauga "has been the cleanest village that we have had in American Samoa. It has increased in cleanliness with nearly each inspection of the sanitary officer." He also stated on the witness stand that there had never been any charge brought to his office that reflected on Mauga's character. The Board of Investigation did find that some of the complaints against Mauga's work as county chief were true, but the fact that the Board did not recommend his removal shows that it did not regard them as very serious.

In view of all the testimony and the circumstances attending this case, the court believes that the charges against Mauga, numerous as they are, do not have much foundation

in fact. Certainly the evidence does not warrant the removal of Mauga. The equities of the case are with him. This court in its decision is bound by the law of American Samoa and must follow it. It cannot under the law remove Mauga from the title unless the evidence shows such misconduct by Mauga as to warrant his removal.

▮ In the beginning of this opinion the court pointed out that the principle of equity to the effect that he who seeks the aid of a court of equity in a matter must himself have acted conscientiously as regards the same matter, is a part of the law of American Samoa.

Have the candidates who lose a matai name case and who later block the efforts of the successful candidate to effect a reconciliation in the family a right under the law of American Samoa to ask the Court to remove him? Does blocking reconciliation of the family constitute conscientious action? We think not.

Did the candidates who lost the Mauga case in November, 1935, and who now ask his removal abide by the Samoan custom of supporting the candidate awarded the title or did they oppose him? Have they given Mauga assistance in his efforts to get the family to live in peace and harmony? Or have they been in opposition to Mauga from the beginning and blocked his efforts to reconcile the family, thereby bringing about some of the very conditions about which they complain? If they have blocked reconciliation by opposing Mauga they themselves are in no position according to the law of American Samoa to ask his removal.

Inasmuch as this case is being decided upon the ground that the evidence taken as a whole in the light of the attendant circumstances does not show such misconduct by Mauga as to warrant his removal, it follows that it is not necessary to pursue the questions contained in the preceding paragraph further.

The removal of the Utaifeau title from Manuma was claimed by the complainant as an act of arrogance and high handedness on the part of Mauga. Mauga testified that the reason he removed the title from Manuma was because he requested Manuma to come and live with him and he refused. We are not at all sure when Manuma failed to follow Mauga's request that Mauga was high handed in removing him from the title, especially in view of Mauga's pule over the title and the further testimony of Saipale that he acted as an interpreter for Judge Wood when Mauga, Sueuga and Manuma came to the Judge's office to discuss the matter of the Utaifeau title and all were told by the Judge that Mauga could give the title to whomsoever he pleased.

But we need not pursue the matter of the Utaifeau title any longer because Mauga in the presence of Teo, Saipale, Sueuga, and his counsel Faiaoga advised the Chief Justice that, in his efforts to effect a reconciliation during the thirty day period granted by the Court for that purpose, he had promised to restore the Utaifeau title. We think, in view of his promise just stated, that equity will require him to keep it, upon the condition that Manuma effect a reconciliation with Mauga and assist him in bringing the family into a state of harmony.

The court, therefore, ORDERS, ADJUDGES and DECREES

(1) that Mauga be not removed from the list of matais.

(2) that Mauga restore the Utaifeau title to Manuma upon Manuma's effecting a reconciliation with Mauga and assisting him to restore harmony in the Mauga family.

Costs of $50.00 are hereby assessed against Sueuga, the same to be paid within 60 days.